**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**KIMBERLY FERKETIC**      )      **Civil Action No.**   2:18CV842
                         )
       **Plaintiff,**      )
                         )      **Judge:**
**vs.**                   )
                         )      **Magistrate:**
                         )
**CURAHEALTH PITTSBURGH, LLC**   )
                         )      **JURY TRIAL DEMANDED**
       **Defendant.**      )
_____/

## COMPLAINT

Plaintiff Kimberly Ferketic brings this action against Curahealth Pittsburgh, LLC under Title VII of the Civil Rights Act of 1964 for gender discrimination involving a physical sexual assault and for negligent supervision and negligent retention.

### Parties

1.    Plaintiff Kimberly Ferketic is a petite, attractive single mother who resides in the Western District of Pennsylvania.

2.    At all times material to this action, Ms. Ferketic worked for Defendant as its Medical Records Supervisor in the medical records room of its long-term acute care hospital at 7777 Steubenville Pike, Oakdale, Pennsylvania, 15071 (hereinafter "the hospital").

3.    Defendant Curahealth Pittsburgh, LLC ("Curahealth") is a Pennsylvania limited liability company and member of the Curahealth Hospital System, which acted by and through

its executive officers, directors, managers, agents, employees and physicians with staff

privileges.  Curahealth owns and operates the hospital.

## Jurisdiction, Venue and Exhaustion

4.      Subject matter jurisdiction exists under 28 U.S.C. §§ 1331, 1343(a)(4) and 1367.

5.      Venue is proper under 28 U.S.C. § 1391(b).

6.      Ms. Ferketic timely filed a Charge of Discrimination with the EEOC on

December 13, 2017, and cross-filed same with the PHRC.  More than 180 days have passed and

Ms. Ferketic has received a right to sue on her Title VII claims.  The PHRC's investigation of

Ms. Ferketic's PHRA claims is ongoing.  Ms. Ferketic will add her PHRA claims to this

Complaint after she exhausts her administrative remedies with the PHRC.

## Facts Giving Rise to This Action

### Medical Staff Credentialing and Privileging

7.      A hospital's medical staff credentialing and privileging process is a continuing

process that involves the Medical Staff Coordinator and the Medical Staff Committee, which

work together to screen applicants and re-applicants to ensure their fitness to work among

hospital employees and provide care to patients.  The Medical Staff Coordinator and the Medical

Staff Committee are trained to spot **RED FLAGS** that call into question an applicant's fitness to

work at the hospital, and to investigate those flags when encountered.

8.      The credentialing and privileging process has two elements: one that verifies a

practitioner's professional education, post-graduate training, experience, board certifications,

professional affiliations and licensure, and, material to this litigation, one that investigates the

applicant's employment background, including but not limited to professional liability claims,

suits or judgments against the practitioner, any prior denials or revocations of medical staff

membership, any prior reductions, suspensions, revocations, relinquishments or non-renewals of clinical privileges, any prior loss, suspension, restriction, denial or relinquishment of professional licensure or professional society membership, any prior or current sanctions or investigations involving the practitioner, prior lawsuits involving the practitioner, and references.

9.      A background check includes, at a minimum, querying a practitioner's National Practitioner's Database file, following up with the practitioner regarding **RED FLAGS** disclosed in the application materials or otherwise uncovered in the review process, contacting and questioning the practitioner's former employers and business colleagues, and reviewing free, publically available court records from litigation involving the practitioner, especially when the practitioner discloses the litigation in his application materials.

10.      The same rules and standards that exist for initial applications for credentials/privileges exist for reapplications.

**Zafar Iqbal, serial sexual predator, M.D.**

11.      Zafar Iqbal, M.D. is a large, brash and physically imposing man.  Undersigned counsel has personally observed Iqbal and estimates he is 5'11",



230 lbs., roughly twice the size of Ms. Ferketic.

12.      Iqbal had staff privileges at the hospital.

13.      In February 2016, the hospital was owned and operated by Kindred Healthcare.

14.      That month, as part of his application to retain staff privileges, under the heading DISCIPLINARY QUESTIONS, Iqbal disclosed to the hospital's Medical Staff Coordinator that he had a history of termination of medical staff membership and/or loss of clinical privileges at other hospitals.  This disclosure was a **RED FLAG**.

FEB/25/2016/THU 04:10 PM   Dr. Iqbal                FAX No. 7248567239                    P. 007/041

**Practitioner's Name:** Zafar Iqbal, MD                                          Page 4

DISCIPLINARY QUESTIONS:

If you answer YES to any of the below questions, you MUST provide full explanation on a separate sheet.

| Question | | |
|---|---|---|
| Are there previously successful or currently pending challenges to any licensure or registration (state or district, Drug Enforcement Administration) or the voluntary or involuntary relinquishment of such licensure or registration? | Yes ☐ | (No) |
| Have there been or is there pending any voluntary or involuntary termination of medical staff membership or voluntary or involuntary limitation, reduction, or loss of clinical privileges at any other hospital? | Yes ☒ | No |
| Has membership or privileges with any type of professional affiliation, organization, or healthcare delivery system, past or present, ever been sanctioned, revoked, suspended, limited, placed on probation, not renewed or relinquished either voluntarily or involuntarily? | Yes ☒ | No |
| Have you ever been charged with or convicted of any crime related to your clinical practice including Medicare or Medicaid related crimes; have you ever been subject to civil money penalties under the Medicare or Medicaid program; have you been suspended from participating in Medicare or Medicaid? | Yes ☐ | (No) |
| Have you ever been indicted or convicted of a crime or been charged with violation of the Harrison Narcotics Act? | Yes ☐ | (No) |
| Have you ever been suspended from practice, reprimanded, censured, or otherwise disciplined or disqualified as a member of any profession or organization? | Yes ☒ | No |
| Have any complaints or charges, formal or informal, ever been made or filed, or proceedings instituted against you? | Yes ☒ | No |
| Have you ever been convicted, indicted or pleaded no contest to any criminal charges (other than motor vehicle speeding violations) brought against you? | Yes ☐ | (No) |
| Currently, are you involved in any proceedings related to medical care in other facilities? | Yes ☒ | No |
| Have you ever been convicted of or pleaded no contest to a drug or alcohol related offense? | Yes ☐ | (No) |

15.     Iqbal further disclosed that other healthcare entities had sanctioned, revoked, suspended, placed on probation, or not renewed his membership or privileges.  This disclosure was a **RED FLAG**.

16.     Iqbal further disclosed that other organizations had suspended him from practice, reprimanded, censured or otherwise disciplined or disqualified him as a member of a profession or organization.  This disclosure was a **RED FLAG**.

17.     Iqbal further disclosed that complaints or charges had previously been made or filed against him, and proceedings had previously been brought against him.  This disclosure was a **RED FLAG**.

18.    Iqbal further disclosed that he was currently involved in proceedings related to medical care at other facilities.  This disclosure was a **RED FLAG**.

19.    Iqbal further disclosed that he had been embroiled in litigation with his former business partner in the Court of Common Pleas of Allegheny County at Case No. GD-02-23533 (captioned as *Iqbal v. Fresenius Medical Care North America et al.,* hereinafter referred to as "*Iqbal I*").  This disclosure was a **RED FLAG**.

---

FEB/25/2016/THU 04:05 PM   Dr. Iqbal          FAX No. 7248567239          P. 001/002

ZAFAR IQBAL, M.D. & ASSOCIATES, INC.
A PROFESSIONAL CORPORATION
SPECIALIZING IN RENAL DISEASES AND HYPERTENSION

| NEW CASTLE OFFICE | BUTLER OFFICE | KITTANNING OFFICE | PASSAVANT OFFICE |
|---|---|---|---|
| 3009 Wilmington Road | 118 South Church Street | 500 Medical Arts Bldg | 9104 Babcock Blvd. |
| Suite C | Butler, PA  16001 | Suite 530 | Suite 5113 |
| New Castle, PA  16105 | | Kittanning, PA  16201 | Pittsburgh, PA  15237 |
| 724-856-7238 | 724-431-0253 | 724-543-1600 | 412-318-4097 |
| 724-856-7239 (fax) | 724-431-0254 (fax) | 724-431-0254 (fax) | 724-856-7239 (fax) |

February 25, 2016

Re: Hospital Credential Officials where I have privileges.

To Whom It May Concern:

I practiced under the group ADL Inc. from November of 1990 until November of 2002 initially as an employee and subsequently as a partner.  In December of 2002, I had an acrimonious break from my ex-partner.  He was also Medical Director of the Fresenius Medical Care (FMC) dialysis clinics where he terminated my privileges.

Despite this, more than 70% of the patients elected to entitle me as their nephrologist.  This resulted in a lawsuit at docket # GD02-23533 in the Court of Common Pleas of Allegheny County in December 2002.  I also appealed my suspension from the FMC dialysis clinics which were restored on April 10, 2003. I contacted my patients who opted for me as their nephrologist while Dr. Lupariello remained the Medical Director.  FMC accused me of solicitation of patients and resuspended my privileges on May 1st, 2003.  My privileges to this unit were restored on December 15, 2006. This unit is now called ARA Central Kittanning Dialysis Clinic (letter attached).

In 2004, Judge Folino ruled that I must resign from four hospitals for a period of nine months to satisfy a contract obligation.  These hospitals included Jameson Memorial Hospital, Butler Memorial Hospital, Armstrong County Memorial Hospital, and UPMC Passavant Hospital.  I re-applied for privileges following the

---

FEB/25/2016/THU 04:05 PM   Dr. Iqbal          FAX No. 7248567239          P. 002/002

after they also "failed to disclose" dialysis center affiliations in their applications. Once Butler Memorial Hospital specifically requested dialysis center information, I immediately provided it. Butler Memorial Hospital then denied me privileges several months later. On appeal, the denial was affirmed by the hospital, despite the hospital hearing panel's specific acknowledgment that the application language created "considerable confusion regarding how to categorize a dialysis center".

The hearing panel recommended that the hospital application be changed to "include a specific category for freestanding dialysis centers". This matter is currently in litigation in the Court of Common Pleas of Butler County at docket # 06-10852. It should be noted that the Butler Memorial Hospital hearing panel, in denying my application, acknowledged that it did not rely upon Fresenius Dialysis Clinics (FMC) and disputes with my ex-partner/employer.}

During the hearing process, it was also revealed that my ex-partner's business office, unknown to me, had failed to submit my renewal application for the Mercy Hospital in 1996. In 1999 Mercy Hospital informed me of this and subsequently led to the withdrawal of my application while still employed by my ex-group. Voluntary resignations of hospital privileges besides mentioned above included: Jefferson Hospital, St. Francis Medical Center (closed), Allegheny Valley Hospital, Grove City Hospital, Weirton Medical Center, Allegheny General Hospital, Canonsburg Hospital, Washington Hospital, and South Side Hospital, UPMC St Margaret. I was on leave from UPMC Passavant from March 27, 2008 until September 8, 2008. Privileges have been active at UPMC Passavant from September 9, 2008.

Currently, as of August 20, 2015 I am on voluntary leave of absence from UPMC Passavant. The due process is not complete regarding a complaint against me.

If you need details of any of the issues mentioned above please do not hesitate to call or write me.

Thank you,

Zafar Iqbal, M.D.

20.     The overwhelming majority of records from *Iqbal I* were and are available to the public free of charge on the Allegheny County Department of Court Records website, including the amended pleadings, summary judgment papers and pretrial statements.

21.     The free, publically available records from *Iqbal I* reflect that in 2000, one of Iqbal's former employee's retained legal counsel and claimed that she was constructively discharged because of Iqbal's "constant train of sexual advances." Iqbal and his partner settled that case. This information was a **RED FLAG**.



DEC 0 5 2000

## Jason R. Greenwald

**Attorney at Law**
2520 Mosside Boulevard, Monroeville, Pennsylvania 15146
(412) 856-8500 Fax (412) 373-4722

December 1, 2000

Mr. Gary P. Hunt, Esquire
1500 One PPG Place
Pittsburgh, Pennsylvania 15222

Re:   Danielle Perl v. Dr. A.D. Lupariello

Dear Mr. Hunt:

This is in response to your letter regarding specific facts, which support a theory of wrongful discharge. There were several ongoing situations in the office of Dr. Lupariello, which lead to the termination of Mrs. Perl. None of them had anything to do with her work performance, competency or the need to eliminate the position, which she was staffing.

It is my understanding from my communications with Mrs. Perl that Mrs. Perl was close friends with Mary Jean Rusak, the office manager prior to Beth Martin. Dr. Lupariello and Mary Jane Rusak had a long term personal relationship and she left her position in the office as a result of giving birth to the child of Dr. Lupariello. Mrs. Perl's knowledge of these facts and her friendship with Mary Jane Rusak were critical factors in the persecution of Mrs. Perl and her eventual termination.

It is also my understanding from communications with Mrs. Perl, that Mrs. Perl was also under the constant train of sexual advances by Dr. Iqbal. The office managers and Dr. Lupariello were aware of the sexual nature of Dr. Iqbal's interaction with Mrs. Perl and the degree to which she was uncomfortable with it However, nothing was done to rectify the situation and deter this behavior. Instead, Mrs. Perl, a dedicated and devoted employee was terminated.

Mrs. Perl worked for the office almost the entire duration of her maternity leave. She was staffing several positions in the office as a result of understaffing upon her return from maternity leave. Your client wanted to force Mrs. Perl to quit her position because

**EXHIBIT**

"C"

22. The free, publically available records from *Iqbal I* reflect that in 2002, Bio-Medical Applications of Pennsylvania, Inc. withdrew its consent for Dr. Iqbal to provide Medical Director services at its clinics due to "complaints by patients and staff about Dr. Iqbal's harassing and/or inappropriate behavior, *particularly sexually suggestive behavior*." This information was a **RED FLAG**.

November 25, 2002

*PERSONAL AND CONFIDENTIAL*
VIA OVERNIGHT MAIL
and CERTIFIED MAIL,
RETURN RECEIPT REQUESTED

Angelo Lupariello, M.D.
1609 Blackburn Heights Drive
Sewickley, Pennsylvania 15143

Re:   Dr. Zafar Iqbal

Dear Dr. Lupariello:

This letter is to advise you that, pursuant to section 3 of the Administrative Consulting Services Agreement dated May 25, 1996, as amended by the Second Amendment to Administrative Consulting Services Agreement dated November 29, 2001, (collectively, the "Agreement"), between Bio-Medical Applications of Pennsylvania, Inc. ("BMA") and you, BMA is withdrawing its consent to your continued designation of Dr. Zafar Iqbal to provide Medical Director services at BMA's dialysis clinics in Kittanning and Butler. Please also be advised that BMA does not and will not consent to Dr. Iqbal's being designated to provide Medical Director services at any other BMA clinic.

As Angie Andring and I have informed you, BMA has been reviewing complaints made by patients and staff about Dr. Iqbal's harassing and/or inappropriate behavior, particularly sexually suggestive behavior. In addition, BMA has been reviewing the issues raised in a grievance filed by a staff member that Dr. Iqbal asserted, in essence, that the staff member was not providing appropriate medical care. Finally, BMA has been reviewing complaints that Dr. Iqbal has failed to round on his patients in a timely manner and failed to complete required medical documentation in a timely manner. While our review is continuing, we have concluded that the facts indicate these complaints are credible and that it would be improper for Dr. Iqbal to continue to provide Medical Director services.

While you may designate a physician to provide Medical Director services at Kittanning and Butler, and the other clinics where you provide Medical Director services under the Agreement, you remain ultimately responsible under the Agreement for assuring the highest standards of patient care. As you know, that means you, or your designee, are obligated to perform, among other requirements, the following:



EXHIBIT

"B"

LUP00085

20.     In his Pretrial Statement in *Iqbal I*, Iqbal's business partner Dr. Lupariello

asserted that he fired Iqbal because of the accusations of sexual misconduct leveled against him.

Dr. Lupariello so testified at trial to Judge Folino as well.  This information was a **RED FLAG**.

The third statement by Dr. Lupariello related to the accusations that Dr. Iqbal has sexually harassed several employees of Defendant Bio-Medical Applications of Pennsylvania, Inc. ("BMA"). It was those accusations which caused BMA, which ran the dialysis clinics at which ADL practiced, to request that ADL remove Dr. Iqbal from the clinics to which he was assigned. (*See* Exhibit "A," testimony of A.D. Lupariello, M.D., Page 241, Lines 21-25; Page 242, Lines 1-7). BMA later formally withdrew permission for Dr. Iqbal to be the acting Medical Director at <u>any</u> of its clinics and then suspended, and ultimately revoked, his clinical privileges at its clinics. (*See* Exhibit "A,' testimony of A.D. Lupariello, M.D., Page 244, Lines 18-25; Page 245, Lines 1-7; Exhibit "B," BMA letter to ADL)

These accusations of personal misconduct by Dr. Iqbal followed a previous incident in which a former employee of ADL had threatened to sue the practice, alleging that she had been "under the train of constant sexual advances by Dr. Iqbal." (See Exhibit "C," letter from Attorney Jason R. Greenwald to ADL dated December 1, 2000). ADL settled that matter before litigation was instituted, but these serious allegations of personal misconduct could no longer be tolerated. Although Dr. Iqbal's medical skills were unquestioned, his personal actions and behavior not only embarrassed ADL, but could have subjected it to additional legal liability. ADL therefore made the difficult decision to terminate him, despite his skills as a physician. (*See* Exhibit "A," testimony of A.D. Lupariello, M.D., Page 247, Lines 3-22).

21.     The free, publically available records from *Iqbal I* further reflected that one of Iqbal's patients accused him of requiring her to remove her shirt and sweater to perform an examination without providing her with a gown.  Dr. Lupariello testified:

```
 9    Q.  I want to go back to one question that I should have
10        asked you before.  You testified about the woman who
11        he was asking her to take her shirt and sweater off.
12            You're a nephrologist.  Is that normal or
13        necessary?  I mean, none of us, the Judge and I
14        aren't.  Is that normal?  Is that necessary?
15    A.  No.  We have gowns that people put on.  I mean, you
16        know, you cover people up.  You don't expose them.
```

This information was a **RED FLAG**.

22.     Iqbal further disclosed in his reapplication materials that he had "voluntarily resigned" his privileges at nine hospitals (Jefferson Hospital, St. Francis Medical Center, Allegheny Valley Hospital, Grove City Hospital, Weirton Medical Center, Allegheny General Hospital, Canonsburg Hospital, Washington Hospital and Southside Hospital, UPMC St. Margaret), and was on a leave of absence from a tenth (UPMC Passavant) because of a "complaint against [him]."  Both disclosures were **RED FLAGS**.

23.     Iqbal's "voluntary resignations" from so many hospitals was a **RED FLAG** because physicians often "voluntarily resign" their staff privileges while under investigation for misconduct.

24.     The complaint against Iqbal at UPMC Passavant involved a nurse who accused Iqbal of forcibly sexually assaulting her in an elevator.  The relevant portion of the nurse's August 29, 2015 report to the McCandless Police Department is set forth below.



| 20150831M8358 | MCP1507542 | 3500 - SUSPICIOUS PERSONS OR CIRCUMSTANCES |

**Main Narrative**
LAWRENCE J. ITRI, SERGEANT (235)

Melissa Smith and her husband, came to the station to report an assault. Smith stated on 8/1/15 at approximately 12:00 pm, was at the Nurses' Station on the fifth floor, Rehab. Smith stated that Dr. Zafar Iqbal approached her and then hugged her. Dr. Iqbal then said lets go to a quiet place and they went further down the hall. While down the hall, Dr. Iqbal asked Smith to have an affair with him. Smith replied, "No, I am married." Again, Dr. Iqbal said let's go somewhere quiet. They both then got into the elevator. While they were in the elevator, Dr. Iqbal kissed Smith and put his tongue in Smith's mouth. Smith then pressed the button to open the elevator. When the door opened, Smith went to her unit and Dr. Iqbal went another way. About a half hour later, Dr. Iqbal returned to Smith's unit, but nothing happened.

At approximately 12:45 pm, Smith reported this incident to the charge nurse, Ed Plezia. Then Smith told the nurse supervisor, Kris Mankey. Smith called her boss, Denise Sponcek, on he way home from work at around 5:00 pm.

On Sunday, Dr. Iqbal again approached Smith and tried to hug her. Smith said no and Dr. Iqbal left her alone. Since this was reported, Smith has been told that Dr. Iqbal is no longer at UPMC Passavant Hospital.

Smith has talked with VOICE out of Butler, PA. Smith also stated that on Tuesday, 9/1/15, she has to meet with the Physicians Board at UPMC Passavant Hospital at 5:00 pm. Smith was given PFA information.

25.     On June 15, 2016, the Passavant nurse filed a sexual battery case against Iqbal in the Court of Common Pleas of Allegheny County captioned *Smith et vir. v. Iqbal*, GD-16-10615 (hereinafter "*Iqbal II*").  This sexual battery case was a **RED FLAG**.



IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

MELISSA SMITH and CRAIG SMITH, her husband,

    Plaintiffs,

vs.

ZAFAR IQBAL, M.D., an individual,

    Defendant.

CIVIL DIVISION

No. GD-16-10615

Issue No.

COMPLAINT

Code: 009

Filed on Behalf of Plaintiffs

Counsel of Record for This Party:

Laura E. Balzarini, Esq.
Pa. I.D. #311358

Firm No. 013
BALZARINI & WATSON
3303 Grant Building
310 Grant Street
Pittsburgh, PA 15219

(412) 471-1200 (phone)
(412) 471-8326 (fax)

FILED,
2016 JUN 15 PM 3:00
ALLEGHENY COUNTY, PA
PROT...

OFINCAROLL
0615-2016    03:01:40
GD-16-010615

> ### COUNT I — SEXUAL BATTERY
>
> 8.   On the date and at the location identified above, the defendant, Zafar Iqbal, M.D. willfully and intentionally engaged in unpermitted and unconsented sexual contact with the wife plaintiff, which consisted of forcibly causing contact between the defendant's mouth and the plaintiff's body.

26.    All the records from *Iqbal II* were publically available free of charge on the Allegheny County Court of Common Pleas Department of Court records website from June 15, 2016 forward.

27.    Shortly after Ms. Smith reported Iqbal's sexual assault, UPMC found that Ms. Smith's complaint against Iqbal was credible and justified and permanently revoked Iqbal's clinical privileges across the entire UPMC Health System.  Iqbal admitted this in the New Matter he filed in *Iqbal II*, which was publicly available to view free of charge.

> 74.    As a result of the Wife-Plaintiff's allegations filed with UPMC Passavant Hospital effective March 17, 2016, the Defendant's appointment and clinical privileges were revoked.
>
> 75.    Subsequently, the Defendant's appointment and clinical privileges at all UPMC hospitals was revoked.

28.    UPMC's revocation of Iqbal's clinical privileges across the entire UPMC health system was a **RED FLAG**.

29.    In addition to *Iqbal I* and *II,* the Allegheny County Department of Court Records website shows that Iqbal has twenty year history of suing and being sued in various matters,

12

including his former spouse suing him in a Protection from Abuse case in 1998.  The multiplicity
of legal matters involving Iqbal, including a PFA case and a sexual battery case, was a
**RED FLAG**.

| CaseNumber | Case Description | Filing Date | Last Name | First Name | Part Type |
|---|---|---|---|---|---|
| GD-18-101356 | Commonwealth of PA vs Iqbal | 04/18/2018 | Iqbal | Zafar | Defendant |
| AR-98-004987 | Kaefer vs Iqbal | 08/10/1998 | Iqbal | Zafar | Defendant |
| FD-98-001249 | Zafar vs Iqbal | 03/27/1998 | Iqbal | Zafar | Defendant in PFA |
| FD-98-001249 | Zafar vs Iqbal | 03/27/1998 | Iqbal | Zafar | Defendant in Divorce |
| FD-92-002473 | Zafar vs Iqbal 003 | 01/05/1995 | Iqbal | Zafar | Defendant in Divorce |
| FD-92-002473 | Zafar vs Iqbal 003 | 01/05/1995 | Iqbal | Zafar | Defendant in Support |
| GD-02-021187 | Estate of Sylvan Israel vs Conte M.D. etal | 11/06/2002 | Iqbal M.D. | Zafar | Defendant |
| GD-02-023533 | Iqbal vs Fresenius Medical Care etal | 12/10/2002 | Iqbal M.D. | Zafar | Plaintiff |
| GD-03-022273 | Iqbal M.D. vs Fresenius Medical Care etal | 11/10/2003 | Iqbal M.D. | Zafar | Petitioner |
| GD-03-022275 | Iqbal M.D. vs Fresenius Medical Care etal | 11/10/2003 | Iqbal M.D. | Zafar | Petitioner |
| GD-16-010615 | Smith etal vs Iqbal M.D. | 06/15/2016 | Iqbal M.D. | Zafar | Defendant |
| GD-99-007586 | Daniels vs Dialysis Clinics Inc. etal | 05/20/1999 | Iqbal M.D. | Zafar | Defendant |

30.     On March 2, 2016, the hospital's Medical Staff Coordinator reviewed records
reflecting that National Medical Care, Inc. had permanently revoked Iqbal's clinical privileges
because Iqbal posed an "Immediate Threat to Health or Safety" due in part to "pattern of
harassing behavior that offended both patients and staff and potentially created a hostile working
environment."   This information was a **RED FLAG**.

31.     On March 2, 2016, the hospital's Medical Staff Coordinator reviewed records
showing that Iqbal had agreed to a "Voluntary Limitation, Restriction or Reduction of Clinical
Privilege(s) While Under, or to Avoid, Investigation Relating to Professional Competence of
Conduct."  This information was a **RED FLAG**.

32.     On March 2, 2016, the hospital's Medical Staff Coordinator reviewed records
showing that Butler Memorial Hospital had denied Iqbal clinical privileges in 2006 because
Iqbal had concealed that his privileges had been revoked by National Medical Care, Inc..  This
information was a **RED FLAG**.

**Curahealth buys Kindred and ignores the red flags**

33.     Curahealth purchased the hospital along with several other Kindred hospitals in October, 2016.

34.     Curahealth hired all of the Kindred employees working at the hospital, including the Medical Staff Coordinator, and all the physicians and other staff on the Medical Staff Committee.

35.     Curahealth conducted a due diligence review of Kindred's files in connection with its acquisition of the hospital.

**The sexual predator strikes**

36.     On November 7, 2017, Iqbal came to Ms. Ferketic's office and sat down to sign some medical records.

37.     Iqbal then stood up, proceeded to the door and locked it.

38.     Iqbal walked directly to Ms. Ferketic and ordered her to stand up from her chair.

39.     He then said, "I'm going to kiss you," or words very close that that effect.

40.     Before Ms. Ferketic could react, Iqbal bear hugged her, pinning her arms to her sides so she could not push him away.

41.     Iqbal forcibly kissed Ms. Ferketic on the lips, penetrating her mouth with his tongue.

42.     Iqbal's ground his penis into Ms. Ferketic's groin and asked in a breathy, lustful voice, "Can you feel that?  Can you feel my hard cock?"

43.     Ms. Ferketic futilely struggled and told Iqbal to stop.

44.     Iqbal then began smelling and kissing Ms. Ferketic's neck, saying "You smell so good," or words very close to that effect.

45.     During this time, Iqbal continued to restrain Ms. Ferketic in a bear hug and continued to grind his penis into Ms. Ferketic's body, asking her whether she could "feel [his] hard cock."

46.     Ms. Ferketic told Iqbal to stop and exclaimed "Enough!"

47.     Ms. Ferketic finally broke away and attempted to separate herself from Iqbal by moving behind a medical records cart.

48.     Iqbal followed Ms. Ferketic and bear hugged her a second time, this time from behind, again pinning her arms down to her sides.

49.     Iqbal ground his penis into Ms. Ferketic's buttocks.

50.     As Ms. Ferketic pled for Iqbal to stop, he raised his hands up and squeezed both Ms. Ferketic's breasts.

51.     Iqbal then reached his left hand into Ms. Ferketic's shirt, painfully squeezed her right breast, and pulled her right breast out of her bra and shirt, exposing it to his view.

52.     Iqbal then began moving his mouth toward Ms. Ferketic's exposed nipple.

53.     Miraculously, Ms. Ferketic broke from Iqbal's grasp and fled behind her desk.

54.     Iqbal then stopped.  He calmly donned his jacket and walked to the door. Before leaving, he told Ms. Ferketic that if she said anything, she would be fired.

55.     Despite Iqbal's threat and intimidation, Ms. Ferketic reported the sexual assault to her female manager two days later.

56.     The police were called.

57.     When the police interviewed Iqbal, he confessed.  The District Attorney has charged Iqbal with Indecent Assault Without Consent and Harassment by Subjecting Another to Physical Contact.

## COURT OF COMMON PLEAS OF ALLEGHENY COUNTY

### DOCKET

Docket Number: CP-02-CR-0003120-2018

## CRIMINAL DOCKET

### Court Case

Commonwealth of Pennsylvania
v.
Zafar Iqbal

Page 2 of 3

### CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 1 | 1 | M2 | 18 § 3126 §§A1 | Indec Asslt-W/O Cons Of Other | 11/07/2017 | G 793010-1 |
| 2 | 2 | S | 18 § 2709 §§A1 | Harassment - Subject Other to Physical Contact | 11/07/2017 | G 793010-1 |

### DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | | Disposition Date | Final Disposition | |
|---|---|---|---|---|
| Sequence/Description | | Offense Disposition | Grade | Section |
| Sentencing Judge | | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | | |
| **Waived for Court (Lower Court)** | Defendant Was Present | | | |
| Lower Court Disposition | | 03/05/2018 | Not Final | |
| 1 / Indec Asslt-W/O Cons Of Other | | Waived for Court (Lower Court) | M2 | 18 § 3126 §§ A1 |
| 2 / Harassment - Subject Other to Physical Contact | | Waived for Court (Lower Court) | S | 18 § 2709 §§ A1 |
| **Proceed to Court** | Defendant Was Not Present | | | |
| Information Filed | | 04/18/2018 | Not Final | |
| 1 / Indec Asslt-W/O Cons Of Other | | Proceed to Court | M2 | 18 § 3126 §§ A1 |
| 2 / Harassment - Subject Other to Physical Contact | | Proceed to Court | S | 18 § 2709 §§ A1 |

58.    After the sexual assault, and even after Curahealth learned that Iqbal had confessed, it failed to revoke his clinical privileges at the hospital.  As recently as May, 2018, Curahealth had still not revoked Iqbal's clinical privileges.

59.    So little does Curahealth care about providing a workplace free from sexual harassment, Curahealth did not even bother to investigate whether Iqbal had sexually harassed other female employees.  Had Curahealth conducted that investigation, it would have learned that Iqbal physically sexually assaulted one of Ms. Ferketic's co-workers.  Iqbal grabbed this woman, who was pregnant at the time, in an elevator and tried to kiss her.  Iqbal then followed her to her car and asked for her phone number.  The co-worker provided Iqbal a fake number to placate him.

60.     Since the sexual assault, Ms. Ferketic has been consistently treating with a medical doctor and a psychotherapist.  They have diagnosed her with Post-Traumatic Stress Disorder, Depression and Generalized Anxiety Disorder.

61.     So far, time has not helped Ms. Ferketic to heal.

62.     Ms. Ferketic's doctor has prescribed her a steadily increasing dosage of anti-anxiety and anti-depressant medications.  Ms. Ferketic's doctor started her with 20 mg of Prozac. When that was not effective, her doctor increased the dosage to 40 mg.  When that was not effective, her doctor increased the dosage to 60 mg.  When that was not effective, her doctor added a prescription for Clonazepam.

63.     Since the assault, Ms. Ferketic has experienced and continues to experience intrusive thoughts, panic attacks, frustration, crying spells, uncharacteristic irritability, insomnia, difficulty concentrating, depressed mood, shame, guilt, a sense of powerlessness, a loss of confidence and self-esteem, loss of career satisfaction, hypervigilance and damage to her personal relationships.

64.     During panic attacks, Ms. Ferketic shakes so violently that she cannot write or even hold a cup of coffee.

65.     Ms. Ferketic's PTSD, GAD and Depression have intermittently incapacitated her from work, requiring her to take unpaid medical leave under the FMLA, and causing her to lose wages.

66.     Since the assault, Curahealth has worsened Ms. Ferketic's PTSD, GAD and Depression.

67.     First, without seeking Ms. Ferketic's consent, it installed cameras in Ms. Ferketic's workspace and placed her under constant surveillance.  This invaded Ms. Ferketic's privacy and made her feel more anxious.

68.     Then Curahealth would not let Ms. Ferketic move around the office without an escort.  This embarrassed Ms. Ferketic in front of her co-workers and made her feel singled out.

69.     Curahealth has also told Ms. Ferketic that it will not seek to revoke Iqbal's clinical privileges unless he is convicted for his crimes.

70.     Finally, Curahealth has continued to grant staff privileges to Dr. William Castillo, yet another doctor accused of Indecent Assault and sexual harassment by a former female employee, who is facing criminal charges for his misconduct.  *See*, https://www.wpxi.com/news/top-stories/doctor-accused-of-assaulting-harassing-employee/730257021, accessed June 19, 2018.

## COUNT I – GENDER DISCRIMINATION INVOLVING SEXUAL ASSAULT
## TITLE VII

71.     Ms. Ferketic incorporates the facts alleged above into this Count as though set forth in full.

72.     An employer is directly liable for sexual harassment by a co-worker or third-party where it either anticipates or should reasonably anticipate the sexual harassment, but fails to take reasonable measures to prevent it.  *Vance v. Ball State University*, 133 S.Ct. 2434, 2453 (2013); *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989) *rev'd in part on other grounds*, 900 F.2d 27, 28 (4th Cir. 1990) (per curiam) (en banc); *Donaldson v. Ronald Lensbouer and Somerset County*, No. 15-63, 2017 WL 2199006 *10-13 (W.D. Pa., May 18, 2017).

73.     In *Vance*, the Supreme Court stressed that a plaintiff in a non-supervisor harassment case can "prevail simply by showing that the employer was negligent in permitting

… harassment to occur." *Id.* at 2451.  The majority rejected the view that its holding precluded employer liability unless the employer had notice of the harassment and failed to take appropriate corrective action. *Id.* at 2453.[1]  It held instead that a complainant can establish employer liability for nonsupervisory harassment "by showing that his or her employer was negligent in failing to prevent harassment from taking place." *Id.*

74.    In *Dunn v. Washington County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005), the Court of Appeals expressly rejected the defendant hospital's argument that it could not be liable for a sexual assault by a non-employee doctor to whom it granted staff privileges (another argument Curahealth advanced to the EEOC).  As Judge Easterbrook cogently explained:

> Because liability [under Title VII] is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer.  ***  Indeed, it makes no difference whether the actor is human.  Suppose a patient kept a macaw in his room, that the bird bit and scratched women but not men, and that the Hospital did nothing.  The Hospital would be responsible for the decision to expose women to the working conditions affected by the macaw, even though the bird (a) was not an employee, and (b) could not be controlled by reasoning or sanctions.  It would be the Hospital's responsibility to protect its female employees by excluding the offending bird from its premises.  This is, by the way, the norm of direct liability in private law as well: a person "can be subject to liability for harm resulting from his conduct if he is negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." *Restatement (2d) of Agency* § 213(d).

---

[1]      Curahealth advocated this rejected view before the EEOC.

75.    At all times material to this Complaint, Curahealth knew, had reason to know or reasonably should have known that Iqbal posed an unreasonable risk of harm to women in the workplace.[2]

76.    Despite Curahealth's actual or constructive knowledge of Iqbal's characteristics, propensities and prior sexual misbehaviors, Curahealth negligently:

a.    Continued to grant Iqbal staff privileges;

b.    Failed to immediately suspend Iqbal in 2016 and prohibit him from entering the premises pending a detailed investigation into the litany of prior sexual misconduct charges made against him;

c.    Failed to review the free, publicly available court records that Iqbal himself had disclosed to the hospital;

d.    Failed to contact any of Iqbal's prior employers or business associates to learn the circumstances under which Iqbal's relationship with them ended;

e.    Failed to conduct a competent and thorough due diligence review of the written materials that Iqbal had supplied to Kindred;

f.    Failed to request employment authorizations from Iqbal and/or use employment authorizations that he provided to collect Iqbal's prior employment records;

g.    Failed to contact any of the litany of other women who had lodged sexual harassment and/or assault complaints against Iqbal;

h.    Failed to conduct a competent and thorough review of Iqbal's National Practitioner's Databank file;

i.    Failed to make specific inquiries to Iqbal himself regarding the multiple red flags in his employment background;

j.    Failed to terminate Iqbal or otherwise revoke his staff privileges;

k.    Failed to supervise Iqbal in his interactions with female employees;

---

[2]    It has been widely reported that women working in the healthcare industry face special risks of sexual harassment.   *See, e.g.*, https://www.nbcnews.com/storyline/sexual-misconduct/harassed-hospitals-operating-rooms-women-medicine-await-their-metoo-moment-n846031, accessed June 20, 2018.

l.  Failed to follow its own hospital bylaws and other governing documents that required the hospital, under the circumstances, to deny Iqbal privileges and/or revoke privileges that he had;

m.  Failed to adopt and/or enforce a reasonable and effective sexual harassment policy;

n.  Failed to adopt and/or enforce a reasonable and effective anti-fraternization policy;

o.  Failed to conduct reasonable and effective anti-sexual harassment training; and,

p.  Failed to warn Ms. Ferketic of Iqbal's dangerous propensities.

77.  As the direct, proximate and foreseeable result of Curahealth's negligence, Iqbal reasonably foreseeably sexually assaulted Ms. Ferketic.

78.  As the direct, proximate and foreseeable result of Curahealth's negligence and Iqbal's foreseeable and preventable misconduct, Ms. Ferketic:

a.  Has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace and humiliation;

b.  Has been and will continue to be prevented from performing and/or enjoying her daily activities and obtaining the full enjoyment of life;

c.  Has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and/or counseling;

d.  Has suffered and will continue to suffer the loss of wages for periods that Ms. Ferketic is incapacitated from work as she attempts to treat and heal from her injuries; and,

e.  Has incurred and will continue to incur case costs and attorney fees to prosecute her claims.

79.  Curahealth's conduct was outrageous, and engaged in with substantial certainty, reckless disregard and/or conscious indifference to the likelihood of harm occurring to others, and/or to Ms. Ferketic's federal right to be free from sexual harassment at work.

WHEREFORE, Plaintiff prays the Court will enter judgment against Curahealth and in favor of Ms. Ferketic, and award Ms. Ferketic damages for:

a.      Past and future pain and suffering;

b.      Past and future embarrassment and humiliation;

c.      Past and future loss of the ability to enjoy the pleasures of life;

d.      Past and future medical expenses;

e.      Past and future losses of wages;

f.      Case costs including full attorney fees;

g.      Punitive damages;

h.      An upward tax adjustment to compensate Ms. Ferketic for the adverse tax consequences of a lump sum award; and,

i.      Such other relief as the Court deems just and proper.

## COUNT II
## NEGLIGENT RETENTION and SUPERVISION

80.     Ms. Ferketic incorporates all paragraphs of this Complaint into this Count as though set forth in full.

81.     Pennsylvania follows § 213 of the Restatement (Second) of Agency with respect to the common law torts of negligent retention and supervision.  *See, e.g.*, PA SSJI (Civ) § 6.120 (2016).

82.     Curahealth was grossly negligent in retaining and supervising Iqbal for the reasons set forth at length above.

83.     Curahealth's gross negligence was outrageous and manifested a reckless indifference to the safety and rights of female employees such as Ms. Ferketic.

WHEREFORE, Plaintiff prays the Court will enter judgment against Curahealth and in favor of Ms. Ferketic, and award Ms. Ferketic damages for:

a.      Past and future pain and suffering;

b.      Past and future embarrassment and humiliation;

c.      Past and future loss of the ability to enjoy the pleasures of life;

d.      Past and future medical expenses;

e.      Past and future losses of wages;

f.      Punitive damages;

g.      An upward tax adjustment to compensate Ms. Ferketic for the adverse tax consequences of a lump sum award; and,

h.      Such other relief as the Court deems just and proper.


Respectfully submitted,

s/ Charles A. Lamberton
Lamberton Law Firm, LLC
Pa. I.D. No. 78043
707 Grant Street, 1705 Gulf Tower
Pittsburgh, PA  15219
412-258-2250
cal@lambertonlaw.com

Counsel for Plaintiff
June 23, 2018